THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing: June 16, 2022                    Mailed: December 20, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
‗‗‗‗‗

Trademark Trial and Appeal Board
‗‗‗‗‗

*DC Comics*
*v.*
*Cellular Nerd LLC*
‗‗‗‗‗

Opposition No. 91246950
‗‗‗‗‗

James D. Weinberger, Leo Kittay, and Daniel M. Nuzzaci of Fross Zelnick Lehrman
    & Zissu, P.C., for DC Comics.

Gary L. Eastman and Sara Gold of Eastman IP for Cellular Nerd LLC.
‗‗‗‗‗

Before Bergsman, Coggins and Hudis,
    Administrative Trademark Judges.[1]

Opinion by Bergsman, Administrative Trademark Judge:

Cellular Nerd LLC (Applicant) seeks registration on the Principal Register of the

composite word and design mark CN (850)GOT-NERD CELLULAR NERD.com

---

[1] Judge Kuczma sat on the panel at the oral argument. She has since retired, and Judge Bergsman has been substituted for her on this decision. The change in composition of the panel does not necessitate a rehearing of the oral argument. *Hunt Control Sys., Inc. v. Koninklijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1560 (TTAB 2011). *See also In re Bose Corp.*, 772 F.2d 866, 227 USPQ 1, 4 (Fed. Cir. 1985) ("[T]here was no error in substituting a board member without allowing reargument. The statutory requirement that a case be 'heard' by three board members means *judicially* heard, not *physically* heard.").

(hereinafter "CELLULAR NERD mark"), reproduced below, for "installation, maintenance and repair of cell phone related hardware," in International Class 37.[2]



Applicant describes its mark as follows:

> The mark consists of the literal element "(850)GOT-NERD 468-6373 CN CN CELLULARNERD.COM" presented in stylized font, with the wording "(850)GOT-NERD" and "CELLULARNERD.COM" in black-shadowed yellow font, the wording "468-6373" in black font, the larger instance of the letters "CN" in red-outlined yellow font, and the smaller instance of the letters "CN" in black-outlined yellow font. In between the wording "(850)GOT-NERD 468-6373" and "CELLULARNERD.COM" is the design of large red-outlined, black and grey-shaded polygon that contains a black and white superhero man wearing black and grey sunglasses, who has a black-outlined red polygon with the smaller instance of the letters "CN" in the center of the polygon in the center of his chest. The remaining white represents background or transparency only.
>
> The color(s) red, yellow, grey, black and white is/are claimed as a feature of the mark.

In the application, Applicant disclaims the exclusive right to use "468-6373."

---

[2] Application Serial No. 87755620 was filed on January 15, 2018, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1052(a), based upon Applicant's claim of first use anywhere and first use in commerce since at least as early as August 31, 2014.

DC Comics (Opposer) filed a Notice of Opposition against the registration of Applicant's CELLULAR NERD mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), and Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c). With respect to the Section 2(d) likelihood of confusion claim, Opposer alleges that Applicant's mark so resembles Opposer's registered and common law trademarks consisting, inter alia, of SUPERMAN, the letter "S" and shield design mark, and the appearance of Clark Kent, Superman's alter ego, pulling apart his shirt, as to be likely to cause confusion. Opposer specifically alleges:

> Superman has become associated with certain symbols and indicia which, in the public mind, are inextricably linked with the Superman character and which function as trademarks … Among the indicia most strongly associated with Superman is the mark SUPERMAN, the S-in-shield design, the appearance of Superman, and the appearance of his alter ego, Clark Kent, as he transforms into Superman in part by pulling apart his shirt to reveal a uniform below bearing the letter "S" inside a five-sided shield on his chest, together with Clark Kent's dark suit, dark and short hair, and glasses (collectively, "Opposer's Marks"), as shown here in images throughout the decades:[3]



---

[3] Notice of Opposition ¶ 3 (1 TTABVUE 7-8).

Citations to the record or briefs in this opinion are to the publicly available documents on TTABVUE, the Board's electronic docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry, if applicable.

Opposer claims ownership of the registered marks listed below:

● SUPERMAN, in typed drawing form,[4] for

➢ "Comic magazines," in International Class 16;[5] and

➢ "Advertising and promotional services-namely, creating advertising for others incorporating comic strip materials," in International Class 35;[6]

● The "S" shield and design, reproduced below,[7] for



➢ "Entertainment services-namely, the production of a series of motion pictures," in International Class 41;[8]

➢ "Bowls, mugs, and glasses," in International Class 21;[9]

---

[4] Prior to November 2, 2003, "standard character" drawings were known as "typed" or "typeset" drawings. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012). A typed or typeset mark is the legal equivalent of a standard character mark. TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 807.03(i) (2022).

[5] Registration No. 1221718, registered December 28, 1982; second renewal.

[6] Registration No. 1216976, registered November 16, 1982; second renewal.

[7] In the registrations for which there is a description of the mark, Opposer describes the mark as consisting of "a 'S' in shield design."

[8] Registration No. 1179537, registered November 24, 1981; third renewal.

[9] Registration No. 1182172, registered December 15, 1981; third renewal. Opposer registered this mark under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).

> ➤ "Adults' and childrens' [sic] clothing-namely, t-shirts, shirts, swimwear, shorts, hats, bibbs [sic], aprons, ties, rainwear, jackets, footwear, sweaters, and loungewear," in International Class 25;[10]

> ➤ "Earrings and stick pins, made of precious metals and pendents [sic] and tie tacks," in International Class 14;[11]

> ➤ "Wallets and umbrellas," in International Class 18;[12] and

● The "S" shield and design, reproduced below, for "comic magazines and sections of comic magazines," in International Class 16.[13]



Applicant, in its Answer, denied the salient allegations of the Notice of Opposition.[14]

---

[10] Registration No. 1184881, registered January 5, 1982; third renewal. Opposer registered this mark under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f).

[11] Registration No. 1197814, registered June 15, 1982; second renewal. On June 13, 2022, Opposer filed a Section 8 declaration of use and its Section 9 renewal application.

[12] Registration No. 1199552, registered June 29, 2982; second renewal. Opposer registered this mark under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f). On June 14, 2022, Opposer filed a Section 8 declaration of use and its Section 9 renewal application.

[13] Registration No. 1173150, registered October 13, 1981; third renewal.

[14] Applicant asserted three purported affirmative defenses. The first affirmative defense, that the Notice of Opposition fails to state a claim upon which relief can be granted, is not an affirmative defense because it asserts the insufficiency of the pleading of Opposer's claims rather than stating a defense to a properly pleaded claim. *TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1101 n.6 (TTAB 2019). Because Applicant did not pursue the purported

## I. Preliminary Issues

Before proceeding to the merits of the proceeding, we address some preliminary issues.

### A. Citing nonprecedential cases

Proceedings before the Board are governed by, inter alia, precedential decisions in prior cases. These decisions include those of the Board, as well as the decisions of the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) (which determines appeals from decisions of the Board); the Court of Customs and Patent Appeals (a predecessor of the Federal Circuit); and the Director of the United States Patent and Trademark Office (formerly the Commissioner of Patents and Trademarks) (Director), who determines petitions seeking review of Board actions on procedural

---

insufficiency in Opposer's pleading by way of motion, nor argue it in its brief, Applicant has waived it. *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

The second affirmative defense, that the dilution "remedy under section 43(c)" of the Trademark Act "is unconstitutional . . . as viewpoint discrimination" based on *Matal v. Tam*, 582 U.S. ___, 137 S. Ct. 1744, 122 USPQ2d 1757 (2017), is waived because Applicant neither litigated, nor addressed the issue in its brief. *Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, at *1 n.3 (TTAB 2020) (various affirmative defenses deemed waived because no evidence or argument presented at trial); *Syndicat Des Proprietaires Viticulteurs De Chateauneuf v. Pasquier DesVignes*, 107 USPQ2d 1930, 1931 n.6 (TTAB 2013) (affirmative defenses neither pursued at trial nor argued in brief deemed waived).

The third affirmative defense, a reservation of the right to assert additional affirmative defenses, is not an appropriate affirmative defense but merely an advisory statement that Applicant reserves the "right" at some future date to add additional affirmative defenses after conducting discovery in this matter. A defendant cannot reserve unidentified defenses because that does not provide a plaintiff fair notice of such defenses. *See, e.g., Philanthropist.com, Inc. v. Gen. Conf. Corp. of Seventh-Day Adventists*, 2021 USPQ2d 643, *4 n.6 (TTAB 2021), *aff'd mem.*, 2022 WL 3147202 (Fed. Cir. 2022); *FDIC v. Mahajan*, 923 F. Supp. 2d 1133, 1141 (N.D. Ill. 2013).

matters. TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 101.03 (2022).

Decisions that are designated by the Board as "Citable as Precedent," "Precedent of the Board," "Precedent of the TTAB," or "for publication in full" are citable as precedent. Since January 23, 2007, the Board has permitted citation to any Board decision or interlocutory order, although a decision or order designated as not precedential is not binding upon the Board, but may be cited for whatever persuasive value it might have. *Id. See also In re tapio GmbH*, 2020 USPQ2d 1138, at *8 n.34 (TTAB 2020) (Board found unpersuasive non-precedential decisions decided on different records); *In re Soc'y of Health and Physical Educators*, 127 USPQ2d 1584, 1587 n.7 (TTAB 2018) ("Board decisions which are not designated as precedent are not binding on the Board, but may be cited and considered for whatever persuasive value they may hold.").

In general, however, the Board discourages the citation to non-precedential opinions. TBMP § 101.03. *See also tapio,* 2020 USPQ2d 1138, at *10 n.30 ("Generally, the practice of citing non-precedential opinions is not encouraged."); *In re Morrison & Foerster LLP*, 110 USPQ2d 1423, 1427 n.6 (TTAB 2014) ("Although parties may cite to non-precedential decisions, the Board does not encourage the practice."); *Corporacion Habanos SA v. Rodriquez*, 99 USPQ2d 1873, 1875 n.5 (TTAB 2011) (although parties may cite to non-precedential cases, the Board does not encourage the practice).

The Board engages in thorough internal review before deciding to designate an opinion addressing the merits of an appeal or trial case, or a decision addressing a contested motion in a trial case, as a precedent of the Board. A Board opinion or decision issued as a precedent serves as controlling legal authority for Board attorneys and judges determining later cases involving the same issue(s). Unless modified or overruled by a later statute, regulation, or Board precedent or upon judicial review, the public may rely upon and cite a Board precedent as authority in subsequent cases involving the same issue(s).

On the other hand, a Board opinion or decision not designated as precedent involves application by a panel of existing law and policy to only the factual record and issues presented in an individual case, and is not controlling legal authority for Board attorneys and judges. Such opinions or decisions do not announce new interpretations of law or agency policy, and the public may not rely upon them as controlling legal authority in other cases. Unless an opinion or decision is marked as a precedent, it is not a precedent of the Board. *Cf. Ex parte Holt*, 19 USPQ2d 1211, 1214 (BPAI 1991) ("[O]pinions are often fact driven by the specific facts present in the appeal before the Board. Unless the facts in a succeeding case are 'on all fours' with or substantially the same as the facts in the preceding appeal, generally, the opinion in the preceding unpublished appeal decision may not be controlling in a succeeding appeal.").

Nevertheless, Opposer cited 14 non-precedential Board opinions in its main brief and nine non-precedential opinions in its reply brief. Whether Opposer is unfamiliar

with Board practice or simply disregarded it, the wholesale citation of nonprecedential cases lessens the persuasive value of Opposer's briefs. Citing nonprecedential cases should be done judiciously and rarely.

### B.    Illegible exhibits

Some of Opposer's exhibits are only partially legible. *See, e.g.*, 38 TTABVUE 440-652, 40 TTABVUE 469 and 485, and 41 TTABVUE 11-86. "The party who submits Internet materials must ensure that the evidence is legible." TBMP § 704.08(b). *See also RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1806 n.16 (TTAB 2018) ("Illegible evidence is given no consideration."), *aff'd*, 377 F. Supp. 3d 588 (E.D. Va. 2019), *aff'd*, 986 F.3d 361, 2021 USPQ2d 81 (4th Cir. 2021); *Alcatraz Media, Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013) (citing *Hard Rock Cafe Licensing Corp. v. Elsea*, 48 USPQ2d 1400, 1404 (TTAB 1998) ("It is reasonable to assume that it is opposer's responsibility to review the documents it submits as evidence to ensure that such submissions meet certain basic requirements, such as that they are legible … .")), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). Illegible materials are of no help to the Board or anyone else in deciding registrability questions before the Board.

We consider the evidence, or a portion of the evidence, only if it is clear and legible.

### C.    Opposer's Registration No. 6304144

In addition to Opposer's pleaded registrations for the marks SUPERMAN and the two "S" shield design marks noted above, Opposer introduced, through a notice of

reliance,[15] Registration No. 6304144 for the design mark reproduced below for the "issuance of credit cards; providing cash and other rebates for credit card use as part of a customer loyalty program," in International Class 36.[16]



Opposer describes the design mark in the registration as follows:

> The mark consists of two beige hands opening a white shirt and dark blue suit jacket with a flapping orange tie to reveal a light blue uniform shirt with the letter "S" design inside a five-sided shield, with the letter "S" and shield outline shown in red and the rest of the shield filled with yellow. The color black is used to outline and shade parts of the image for texture.
>
> The color(s) beige, white, dark blue, orange, light blue, red and yellow is/are claimed as a feature of the mark.

Registration No. 6304144 is not one of Opposer's pleaded registrations, nor did Opposer plead ownership of the underlying application. Opposer did not seek to amend its Notice of Opposition to add Registration No. 6304144 (or the underlying application) as one of its pleaded registrations. Therefore, we must determine

---

[15] 35 TTABVUE 4 and 54-56.

[16] Registered March 30, 2021, based on Serial No. 88820394 filed March 4, 2020, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Opposer's claim of first use anywhere and in commerce as of July 17, 2019.

Opposer filed the application (March 4, 2020) one year after filing the Notice of Opposition (March 13, 2019). We note that Opposer purportedly first used the mark (July 17, 2019) four months after filing the Notice of Opposition.

whether consideration of that registration was tried by express or implied consent pursuant to Fed. R. Civ. P. 15(b)(2).

In paragraph No. 3 of the Notice of Opposition, Opposer alleges that Clark Kent, Superman's alter ego, pulling his shirt apart as he transforms into Superman, is one of Opposer's common law marks.[17]

In the above-noted notice of reliance, Opposer stated that "[t]hese trademark registrations [including Clark Kent pulling his shirt apart] are relevant to show Opposer's trademark rights and business practices."[18] In this regard, during the prosecution of the application at issue, Applicant explained that its mark calls to mind Clark Kent transforming into Superman:

> All of the design is in a distinctive cartoon style, like a superhero comic graphic, familiar to consumers at large, with shading of the text characters top to bottom. The major features of the design are 1) the CN in the background, within a diamond shape reminiscent of Superman's crest; 2) The character in the front, pulling open his shirt (like Clark Kent would before changing into Superman); and 3) the large letter Cellular Nerd.com in the front bottom.[19]

---

[17] Notice of Opposition ¶ 3 (1 TTABVUE 7-8).

[18] 35 TTABVUE 2.

[19] October 14, 2018 Response to an Office Action (TSDR 3 and 8). Citations to the prosecution history of Applicant's application refer to the USPTO Trademark Status and Document Retrieval (TSDR) system in the downloadable .pdf format.

Kevin Morris, Vice President, Worldwide Franchise Management and Marketing, for Warner Bros. Consumer Products Inc., which acts as the licensing agent for Opposer,[20] testified as follows:[21]

> 10. The S-Shield Design is a fundamental symbol of the identity of Superman. When springing into action as Superman, Clark Kent is often depicted in comic books and media as ripping open the buttons of his shirt to reveal his Superman uniform underneath, as shown below:



> 11. Since at least as early as 1939, some form of the S-Shield Design has always appeared emblazoned across Superman's chest. As a result, the S-Shield Design, on its own and together with the shirt-ripping action, has become a longstanding, iconic indicia of the Superman property, with numerous references to it appearing in unsolicited press and across pop culture.

> 12. In fact, on March 30, 2021, the United States Patent and Trademark Office issued to Opposer U.S. Trademark Registration No. 6304144 for the below mark:

---

[20] Morris Testimony Decl. ¶ 1 (44 TTABVUE 2).

[21] *Id.* at ¶¶ 10-12 (44 TTABVUE 4-5).



in International Class 36 for use in connection with "Issuance of credit cards; Providing cash and other rebates for credit card use as part of a customer loyalty program."

Applicant, in its brief, identifies Opposer's "S" shield design mark, including the mark in Registration No. 6304144, as one of the marks Opposer asserts.

> This opposition should be dismissed because there is no likelihood of consumer confusion when Applicant's Mark is compared directly to the S-Shield Design … Opposer in its trial brief asserts seven specific registrations (Opposer's Brief p. 24), all of which show the S-Shield Design in isolation. (35 TTABVUE Exs. 1-6, 9.)[22]

Applicant's reference to 35 TTABVUE 9 is Registration No. 6304144.

Accordingly, we find that Applicant has impliedly consented to including Registration No. 6304144 as one of Opposer's pleaded registrations, and the Notice of Opposition is deemed amended to reflect Registration No. 6304144 as one of Opposer's pleaded registrations. Fed. R. Civ. P. 15(b)(2).

D.    Applicant's informal Facebook survey

Eric Vines, Applicant's co-owner and manager, conducted a "poll" on Applicant's Facebook page "to get a public opinion." Respondents are all Applicant's customers for whom Applicant has performed repairs, or they are family and friends of Mr.

---

[22] Applicant's Brief, p. 5 (57 TTABVUE 7). Exhibits 35 TTABVUE 7 and 8 are the mark SUPERMAN in typed drawing form.

Vines.[23] We reproduce below Applicant's "poll" question as it appears on its Facebook page.[24]



Vines testified that there were 100 respondents.[25] Eighty-two percent of the respondents said the CELLULAR NERD mark does not make them think of Superman, and 18% of the respondents said the CELLULAR NERD mark makes them think of Superman.[26]

Opposer introduced the "poll" to show that there is a likelihood of confusion, arguing that 18% of the respondents who thought that Applicant's mark "calls to

---

[23] Vines Discovery Dep., pp. 106-107 (36 TTABVUE 482-483).

[24] Vines Discovery Dep., Exhibit 12 (36 TTABVUE 677).

[25] Vines Discovery Dep., p. 109 (36 TTABVUE 485).

[26] Vines Discovery Dep., p. 108 (36 TTABVUE 484).

mind Opposer" is sufficient to prove likelihood of confusion.[27] However, Applicant's "poll" is not probative and its results are not persuasive.

Applicant did not conduct its poll in accordance with accepted principles and methods for conducting a survey. Applicant's "poll" was designed by a cellphone repair service technician/business owner. To list just a few of the obvious flaws, the "poll" was designed without regard to the appropriate universe of respondents, it informed potential respondents of the purpose of the "poll," it used a leading question, and Applicant did not validate the participation of respondents. "If a survey was so informally designed and conducted that it fails key tests of professionalism and reliability, it can be excluded from evidence." 6 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:158 (5th ed. September 2022 update) (citing *Hodgon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178 (D. Kan. 2007) (survey designed without input from professional survey person and distributed by plaintiff's employees from booth at trade show was held "untrustworthy and inadmissible" and excluded from evidence.)). *See also Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007) ("[S]urvey evidence in debt-collection as in trademark cases must comply with the principles of professional survey research; if it does not, it is not even admissible."); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 458 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017) (survey excluded because, among other reasons, the survey person was not qualified to conduct a trademark confusion survey).

---

[27] Opposer's Brief, pp. 48-49 (56 TTABVUE 50-51).

"Surveys which are conducted in accordance with accepted principles of survey research, and are properly introduced in evidence, are admissible in proceedings before the Board as exceptions to the hearsay rule." *In re Wilcher Corp.*, 40 USPQ2d 1929, 1934 (TTAB 1996). Eric Vines did not conduct his "poll" in accordance with accepted principles of survey research; rather, he simply obtained the thoughts of some of Applicant's customers and his family and friends to see what they thought about the issue in this proceeding, even going so far as to tell the respondents why he was conducting the "poll." Because Applicant's "poll" is not admissible as a survey, the results of the "poll" (that is, the statements made by those who responded to the poll) are inadmissible hearsay. Fed. R. Evid. 801 and 802. *See also Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 286 (W.D.N.Y. 2019) ("[A] survey that fails to apply an appropriate methodology is essentially nothing more than a collection of hearsay, with no indicia of reliability."), *aff'd*, 824 F. App'x 75 (2d Cir. 2002) .

In view thereof, we do not give the results of Applicant's "poll" any consideration.

## II.   The Record

The record includes the pleadings, and under Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), Applicant's application.

The parties submitted the testimony and evidence listed below:

  A. Opposer's testimony and evidence.

    1. Notice of reliance on copies of Opposer's pleaded registrations and Registration No. 6304144 printed from the USPTO TSDR database displaying the current status of and title to the registrations;[28]

    2. Notice of reliance on Applicant's responses to Opposer's first set of interrogatories;[29]

    3. Notice of reliance on Applicant's first and second supplemental responses to Opposer's first set of interrogatories;[30]

    4. Notice of reliance on the discovery deposition of Adrian Coates, a freelance digital artist and comic book artist hired by Applicant's principal;[31]

    5. Notice of reliance on the discovery deposition of Eric DeMara, a co-owner owner of Applicant;[32]

    6. Notice of reliance on the discovery deposition of Eric Vines, co-owner/manager of Applicant;[33]

    7. Notice of reliance on copies of articles in printed publications purportedly to show the strength and fame of SUPERMAN and the "S" shield design;[34]

    8. Notice of reliance on copies of Internet documents purportedly to show the history, development, use, notoriety, strength and fame of SUPERMAN and the "S" shield design;[35] and

    9. Testimony declaration of Kevin Morris, Vice President, Worldwide Franchise Management and Marketing, for Warner Bros. Consumer Products Inc. (WBCP), which acts as the licensing agent for Opposer.[36]

---

[28] 35 TTABVUE.

[29] 36 TTABVUE 10-17.

[30] 36 TTABVUE 19-40.

[31] 36 TTABVUE 42-199.

[32] 36 TTABVUE 201-374.

[33] 36 TTABVUE 376-683.

10.    Testimony declaration of Kevin Morris, Vice President, Worldwide Franchise Management and Marketing, for Warner Bros. Consumer Products Inc. (WBCP), which acts as the licensing agent for Opposer.[37]

B.    Applicant's evidence.

1.    Notice of reliance on copies of third-party registrations;[38]

2.    Notice of reliance on excerpts from Applicant's website printed by the Way Back Machine website (web.archive.org/web/ 20141209055144/http://www.cellularnerd.com);[39]

3.    Notice of reliance on Applicant's website;[40]

4.    Notice of reliance on Applicant's Facebook page;[41]

5.    Notice of reliance on Applicant's Instagram webpage;[42] and

6.    Notice of reliance on Applicant's Yelp* webpage postings.[43]

## III.   Entitlement to a Statutory Cause of Action

Entitlement to a statutory cause of action, formerly referred to as "standing" by the Federal Circuit and the Board, is an element of the plaintiff's case in every inter

---

[34] 37-39 TTABVUE.

[35] 40 TTABVUE.

[36] 44 TTABVUE. The Board posted the portions of the Morris declaration Opposer designated confidential at 42 TTABVUE.

[37] 44 TTABVUE. The Board posted the portions of the Morris declaration Opposer designated confidential at 42 TTABVUE.

[38] 54 TTABVUE 19-121. Applicant included eight unpleaded registrations owned by Opposer. 54 TTABVUE 68-83.

[39] 54 TTABVUE 127-133 and 193-206.

[40] 54 TTABVUE 135-146, 154-173, 175-191, and 212-239.

[41] 54 TTABVUE 147-153.

[42] 54 TTABVUE 207-211.

[43] 54 TTABVUE 240-248.

partes case. *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). To establish entitlement to a statutory cause of action, a plaintiff must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration of the mark. *Corcamore*, 2020 USPQ2d 11277 at *4. *See also Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982); *Spanishtown Enters., Inc. v. Transcend Resources, Inc.*, 2020 USPQ2d 11388, at *1 (TTAB 2020).

Here, Opposer's claim of use and registration of its "S" shield design marks establish that it is entitled to oppose the registration of Applicant's mark.[44] *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (pleaded registrations "suffice to establish … direct commercial interest"; a belief in likely damage can be shown by establishing a direct commercial interest); *New Era Cap Co. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *6 (TTAB 2020) (pleaded registrations establish statutory entitlement to bring opposition); *Syngenta Crop Prot. Inc. v. Bio-Chek LLC*, 90 USPQ2d 1112, 1118 (TTAB 2009) (testimony that

---

[44] 35 TTABVUE; Morris Testimony Decl. ¶¶ 8, 10-12, 21, 24, and 30-39 (44 TTABVUE 3-5, 7-8, and 10-13).

plaintiff uses its mark "is sufficient to support [plaintiff's] allegations of a reasonable belief that it would be damaged ….").

Applicant, in its brief, does not contest Opposer's entitlement to a statutory cause of action, and at the oral hearing Applicant conceded Opposer's entitlement to a statutory cause of action.

Once Petitioner shows an entitlement to a statutory cause of action on one ground, it has the right to assert any other grounds in an opposition proceeding. *See Hole In 1 Drinks, Inc. v. Lajtay*, 2020 USPQ2d 10020, at *3 (TTAB 2020); *Poly-America, L.P. v. Ill. Tool Works Inc.*, 124 USPQ2d 1508, 1512 (TTAB 2017) (if petitioner can show standing on the ground of functionality, it can assert any other grounds, including abandonment), *aff'd*, No. 3:18-cv-00443-C (N.D. Tex. Oct. 29, 2019), *appeal dismissed*, No. 19-11180 (5th Cir. Feb. 4, 2020); *Azeka Bldg. Corp. v. Azeka*, 122 USPQ2d 1477, 1479 (TTAB 2017) (standing established based on surname claim sufficient to establish standing for any other ground).

## IV. Priority and Likelihood of Confusion

Section 2(d) of the Trademark Act prohibits the registration of a mark that "[c]onsists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). To prevail on its Section 2(d) claim, Opposer must prove, by a preponderance of the evidence, that it has priority in the use of its pleaded marks and

that use of Applicant's mark is likely to cause confusion, mistake, or deception as to the source or sponsorship of Opposer's goods or services, *Cunningham v. Laser Golf Corp.*, 55 USPQ2d at 1848, even in the absence of contrary evidence or argument. *Threshold TV, Inc. v. Metronome Enters., Inc.*, 96 USPQ2d 1031, 1040 (TTAB 2010).

### A. Priority

The pleaded registrations that establish Opposer's entitlement to maintain this opposition also establish that priority is not an issue as to the marks and the goods and services covered by the registrations. *See Mini Melts, Inc. v. Reckitt Benckiser LLC*, 118 USPQ2d 1464, 1469 (TTAB 2016) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974)).

Applicant has not counterclaimed to cancel these registrations and, in its brief, does not contest Opposer's prior use of its SUPERMAN and "S" shield design marks.

### B. Likelihood of confusion

We base our determination under Section 2(d) on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered, referred to as "*DuPont* factors"); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). "Whether a likelihood of confusion exists between an applicant's mark and a previously registered mark is determined on a case-by-case basis, aided by application of the thirteen *DuPont* factors." *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 128 USPQ2d 1686, 1689 (Fed. Cir. 2018). "In

discharging this duty, the thirteen *DuPont* factors 'must be considered' 'when [they] are of record.'" *In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162 (Fed. Cir. 2019) (quoting *In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997) and *DuPont*, 177 USPQ at 567). "Not all *DuPont* factors are relevant in each case, and the weight afforded to each factor depends on the circumstances. Any single factor may control a particular case." *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 2020 USPQ2d 10341, at *3 (Fed. Cir. 2020) (citing *Dixie Rests.*, 41 USPQ2d at 1533).

"Each case must be decided on its own facts and the differences are often subtle ones." *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 177 USPQ 386, 387 (CCPA 1973). "Two key factors in every Section 2(d) case are the first two factors regarding the similarity or dissimilarity of the marks and the goods or services, because the 'fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.'" *In re Embiid*, 2021 USPQ2d 577, at *10 (TTAB 2021) (quoting *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976)). *See also In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods.'") (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002)); *In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004).

For the sake of economy, we confine our analysis to the issue of likelihood of confusion between Applicant's mark and Opposer's "S" shield design marks, including Registration No. 6304144, discussed in the Preliminary Issues section. The "S" shield design marks are the most similar to Applicant's mark. If we cannot sustain the opposition on basis of these registered marks, we could not sustain it on the basis of the other marks. *See In re St. Julian Wine Co.*, 2020 USPQ2d 10595, at *3 (TTAB 2020); *N. Face Apparel Corp. v. Sanyang Indus. Co.*, 116 USPQ2d 1217, 1225 (TTAB 2015); *In re Max Cap. Grp. Ltd.*, 93 USPQ2d 1243, 1245 (TTAB 2010).

> 1.     The strength of Opposer's "S" shield design marks

To determine a mark's strength, we consider its inherent strength, based on the nature of the mark itself, and its commercial strength, based on its recognition in the marketplace. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength …."); *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1345 (TTAB 2017); *Top Tobacco, L.P. v. N. Atlantic Operating Co.*, 101 USPQ2d 1163, 1171-72 (TTAB 2011) (the strength of a mark is determined by assessing its inherent strength and its commercial strength); *Tea Bd. of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1899 (TTAB 2006) (market strength is the extent to which the relevant public recognizes a mark as denoting a single source); 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:80 ("The first enquiry is for conceptual strength and focuses on the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value

of the mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use.").

Commercial strength may be measured indirectly, by volume of sales and advertising expenditures and factors such as length of use of the mark, widespread critical assessments, notice by independent sources of the goods or services identified by the mark, and general reputation of the goods or services. *Weider Publ'ns, LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1354 (TTAB 2014).

a.      Inherent strength

Opposer's "S" shield design marks are registered for the following goods and services, without any claim of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f):

● "Earrings and stick pins, made of precious metals and pendents [sic] and tie tacks," in International Class 14;

● "Comic magazines and sections of comic magazines," in International Class 16;

● "Issuance of credit cards; providing cash and other rebates for credit card use as part of a customer loyalty program," in International Class 36; and

● "Entertainment services-namely, the production of a series of motion pictures," in International Class 41.

Although the "S" shield design marks may appear on the chest of Superman's costume,[45] and Opposer uses the design as a symbol of the Superman character, the "S" shield design marks are also used and registered as independent, stand-alone

---

[45] Morris Testimony Decl. ¶¶ 10-11 (44 TTABVUE 4-5).

marks.[46] To be clear, the only rights we are according Opposer are in the "S" shield design marks as independent, stand-alone marks. The independent, stand-alone "S" shield design marks have no descriptive significance as applied to any of the goods or services in connection with which they may be used. As such, the "S" shield design marks are arbitrary marks and, therefore, inherently or conceptually strong marks. *See Nautilus Grp., Inc. v. Icon Health & Fitness, Inc.*, 372 F.3d 1330, 71 USPQ2d 1173, 1180 (Fed. Cir. 2004) (defining an arbitrary mark as a "known word used in an unexpected or uncommon way" and observing that such marks are typically strong). *See also Palm Bay Imps., Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) (arbitrary terms are conceptually strong trademarks); *In re Ginc UK Ltd.*, 90 USPQ2d 1472, 1479 (TTAB 2007) (completely unique and arbitrary, if not coined, nature of mark in relation to goods entitles the registered mark to a broad scope of protection, and significantly increases the likelihood that the marks, when used in connection with the identical goods would cause confusion).

However, Opposer registered Registration No. 1182172 for "bowls, mugs, and glasses," Registration No. 1184881 for "adults' and childrens' [sic] clothing-namely, t-shirts, shirts, swimwear, shorts, hats, bibbs [sic], aprons, ties, rainwear, jackets, footwear, sweaters, and loungewear," and Registration No. 1199552 for "wallets and umbrellas" under the provisions of Section 2(f) of the Trademark Act, 15 U.S.C.

---

[46] *See, e.g.,* 40 TTABVUE 28, 35, 39, 43, 54, 75-83, and 86-88; 43 TTABVUE 557-622 (improperly designated confidential).

§ 1052(f). A claim of distinctiveness under Section 2(f), whether made in the application as filed or in a subsequent amendment, may be construed as a concession that the matter to which it pertains is not inherently distinctive and, thus, not registrable on the Principal Register absent proof of acquired distinctiveness. *See Yamaha Int'l Corp. v. Hoshino Gakki Co.*, 840 F.2d 1572, 6 USPQ2d 1001, 1005 (Fed. Cir. 1988) ("[I]n cases where registration was initially sought on the basis of distinctiveness, subsequent reliance by the applicant on Section 2(f) assumes that the mark has been shown or conceded to be merely descriptive."); *In re Cabot Corp.*, 15 USPQ2d 1224, 1229 (TTAB 1990) ("[A]pplicant's filing of the initial application under Section 2(f) is tantamount to an admission that this package [i.e., "the shape of the pillow-pack container along with the trade dress (white circle surrounded by blue border")] lacks inherent distinctiveness."). *See also Cold War Museum, Inc. v. Cold War Air Museum, Inc.*, 586 F.3d 1352, 92 USPQ2d 1626, 1629 (Fed. Cir. 2009) ("Where an applicant seeks registration on the basis of Section 2(f), the mark's descriptiveness is a nonissue; an applicant's reliance on Section 2(f) during prosecution presumes that the mark is descriptive."); *In re Am. Furniture Warehouse CO*, 126 USPQ2d 1400, 1403 (TTAB 2018) (noting that a claim of acquired distinctiveness by applicant to overcome a refusal in a prior registration for the same wording in connection with the same services "can be viewed as a concession by [a]pplicant that the wording itself is not inherently distinctive for those services."). At least in connection with the goods associated with Registration Nos. 1182172,

1184881, and 1199552, we may treat the Section 2(f) claim as a concession by Opposer that the "S" shield design mark is not inherently distinctive.[47]

Applicant argues, in essence, that Opposer's "S" shield design marks are not inherently or conceptually strong because "Opposer is not the substantially exclusive user of the initialed chest badge, which is a common branding device of the male superhero archetype."[48] To corroborate its argument, Applicant introduced "50+ third-party registrations" to "show that an initialed chest badge is a common branding feature more suggestive of the 'identifiable genus of superhero musclemen' than of Opposer specifically."[49]

Third-party registrations may be used in the manner of a dictionary to show that a mark or a portion of a mark is descriptive or suggestive of goods and services. *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1675 (Fed. Cir. 2015); *Institut Nat. des Appellations D'Origine v. Vintners Int'l Co.*, 958 F.2d 1574, 22

---

[47] There is nothing in the record indicating why these three registrations were registered under Section 2(f) of the Trademark Act. Presumably, the USPTO initially refused to register the marks because the Examining Attorneys held the marks were ornamentation on the products rather than as technical trademarks and, in response, Opposer submitted evidence to show that the marks had acquired distinctiveness. *See, e.g.*, TMEP §§ 1202.03 *et seq.*

[48] Applicant's Brief, p. 10 (57 TTABVUE 12).

[49] Applicant's Brief, p. 10 (57 TTABVUE 12). Applicant's third-party registrations are at 54 TTABVUE 19-121.

Applicant's third-party registration evidence is not relevant to disprove the commercial strength of Opposer's pleaded registrations because actual use, not registrations, is probative of the purported commercial strength of the plaintiff's mark. *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1057 (TTAB 2017) ("[T]hird-party registration evidence that does not equate to proof of third-party use may bear on conceptual weakness if a term is commonly registered for similar goods or services."). *See also In re FCA US LLC*, 126 USPQ2d 1214, 1224 (TTAB 2018) ("Evidence of third-party use may reflect commercial weakness."), *aff'd mem.*, 778 F. App'x 962 (Fed. Cir. 2019).

USPQ2d 1190, 1196 (Fed. Cir. 1992) (third-party registrations show the sense in which a word is used in ordinary parlance and that a particular term has descriptive significance as applied to certain goods or services); *In re J.M. Originals Inc.*, 6 USPQ2d 1393, 1394 (TTAB 1987) ("[T]hird party registrations are of use only if they tend to demonstrate that a mark or a portion thereof is suggestive or descriptive of certain goods and hence is entitled to a narrow scope of protection. Used in this limited manner, 'third party registrations are similar to dictionaries showing how language is generally used.'") (internal citation omitted.).

However, as indicated above, we are according Opposer rights only in the "S" shield design marks as independent, stand-alone marks, and not rights in all chest badges per se. To be clear, we find that Opposer is asserting rights only in the "S" shield design displayed in Opposer's pleaded registrations.

Accordingly, we analyze Applicant's third-party registration evidence limited to registrations that have some similarity to Opposer's "S" shield design. The following are the third-party registrations that most closely resemble the Opposer's "S" shield design marks:[50]

---

[50] We do not consider application Serial No. 88389311 for the composite word and design mark S STRITTMATTER for "installation and repair of heating, ventilating and air conditioning equipment" (54 TTABVUE 63) or Serial No. 88473899 for the mark AS in a shield design for automobile insurance and repair services (54 TTABVUE 98) because they are not registered. Pending applications are evidence only that the applications were filed on a certain date; they are not evidence of use of the marks. *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1270 n.8 (TTAB 2009); *In re Fiesta Palms LLC*, 85 USPQ2d 1360, 1366 n.7 (TTAB 2007); *Nike Inc. v. WNBA Enters. LLC*, 85 USPQ2d 1187, 1193 n.8 (TTAB 2007).

● Registration No. 3960406 for the mark reproduced below for, inter alia, computer hardware and software for providing Internet security;[51]



● Registration No. 4077002 for the mark reproduced below for "pest control and extermination other than for agricultural purposes";[52]



● Registration No. 5194534 for the mark RUNNING PLUMBING and design, reproduced below for, inter alia, plumbing services;[53]



---

[51] 54 TTABVUE 31.

[52] 54 TTABVUE 35.

[53] 54 TTABVUE 45.

● Registration Nos. 5232711, 5226950, and 5230226 for the "S" shield design reproduced below for, inter alia, computer hardware and computer hardware technical support services;[54]



● Registration No. 5256257 for the mark SD shield design reproduced below for plumbing services;[55]



● Registration No. 3214875 for the mark SHOWERMAN and design reproduced below for installation and custom manufacture of shower enclosures;[56]



---

[54] 54 TTABVUE 47, 49, and 61.

[55] 54 TTABVUE 51.

[56] 54 TTABVUE 55.

● Registration No. 5895381 for the mark SOLUTION-MAN and design reproduced below for "building and maintenance repair";[57]



● Registration No. 5714729 for the mark T and shield design reproduced below for maintenance and repair of trucks and truck parts;[58]



● Registration No. 2193247 for the mark B and design reproduced below for installation and servicing of window coverings;[59] and



---

[57] 54 TTABVUE 59.

[58] 54 TTABVUE 84.

[59] 54 TTABVUE 100.

● Registration No. 4944521 for the mark CELLSAVERS and design reproduced below for repair of electronic apparatus;[60]



Of these 10 marks, the "S" shield design  , the SHOWERMAN mark

 , the SOLUTION MAN mark  , and the B and superhero design

mark  have some resemblance to Opposer's "S" shield design marks. However, they are not qualitatively, nor quantitatively, analogous to the evidence the Federal Circuit found probative in *Juice Generation* and *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129 (Fed. Cir. 2015).[61] In other words, Applicant's third-party registration evidence does not detract from the inherent strength of Opposer's "S" shield design marks.

---

[60] 54 TTABVUE 112.

[61] In *Jack Wolfskin*, there were at least 14 third-party registrations and uses of paw print marks that showed the weakness of that design element in the opposer's mark, 116 USPQ2d at 1136 n.2, while in *Juice Generation*, there were approximately 36 third-party registrations and uses of marks containing the words "Peace" and "Love" that showed the weakness of those words in the opposer's marks. 115 USPQ2d at 1673 n.1.

b.    Commercial strength

Opposer pleads and argues that its "S" shield design marks are famous.[62] Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales of and advertising expenditures for the goods and services identified by the marks at issue, "the length of time those indicia of commercial awareness have been evident," widespread critical assessments and through notice by independent sources of the products identified by the marks, as well as the general reputation of the products and services. *Bose Corp. v. QSC Audio Prods. Inc.*, 63 USPQ2d at 1305-06 and 1309. Raw numbers alone may be misleading, however. Thus, some context in which to place raw statistics may be necessary, for example, market share or sales or advertising figures for comparable types of goods. *Id.* at 1309. Other contextual evidence probative of the renown of a mark may include the following:

---

[62] Notice of Opposition ¶¶ 6 and 18 (1 TTABVUE 8 and 14-23); Opposer's Brief, pp. 8, 12-24, and 33-38 (56 TTABVUE 10, 14-26, and 35-40).

● extent of catalog and direct mail advertising, email blasts, customer calls, and use of social media platforms, such as Twitter, Instagram, Pinterest, and Facebook, identifying the number of followers;

● the number of consumers that Opposer solicits through its advertising throughout the year;

● local, regional, and national radio and television advertising campaigns, free-standing print campaigns, and mentions in national publications;

● unsolicited media attention; and

● product placement in television and in movies.

*Omaha Steaks Int'l*, 128 USPQ2d at 1690-91.

Because of the wide latitude of legal protection we accord a famous mark, and the dominant role fame plays in the likelihood of confusion analysis, Opposer has the duty to clearly prove the fame of its pleaded marks. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1720 (Fed. Cir. 2012) (citing *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007)).

Finally, in the likelihood of confusion analysis, "fame 'varies along a spectrum from very strong to very weak.'" *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003)).

With this framework in mind, we turn to Opposer's evidence of fame listed below:[63]

---

[63] Kevin Morris testified about the consumer research conducted by Warner Brothers Consumer Products regarding public brand familiarity and awareness of "the SUPERMAN

● Opposer "introduced Superman in *Action Comics No. 1* in 1938. The Superman character was so popular that he became the star of an eponymous comic book series in 1939."[64]

● Superman wears a blue costume with a five-sided, diamond-shaped, red and yellow "S-Shield Design" (i.e., the "S" shield design mark).[65]

● "Since at least as early as 1939, some form of the S-Shield Design has always appeared emblazoned across Superman's chest."[66]

● When Superman's alter ego, Clark Kent, springs into action, he is often depicted in comic books and other media as ripping open the buttons of his shirt to reveal his Superman costume underneath as shown below:[67]



brand." However, the testimony was too vague to be probative and the corroborating exhibit referencing the Superman "character" was mostly redacted and incomprehensible. Morris Testimony Decl. ¶¶ 40 and 41 Exhibit G (42 TTABVUE 13; 43 TTABVUE 644-654; 44 TTABVUE 11).

[64] Morris Testimony Decl. ¶ 9 (44 TTABVUE 4).

[65] Morris Testimony Decl. ¶ 10 (44 TTABVUE 4).

[66] Morris Testimony Decl. ¶ 11 (44 TTABVUE 5).

[67] Morris Testimony Decl. ¶ 10 (44 TTABVUE 4).

- "To date, [Opposer] has sold hundreds of millions of Superman comics to consumers in the United States alone, making it one of the best-selling action hero comic book series of all time."[68]

- In 2013, the year before Applicant first used its CELLULAR NERD mark, Opposer sold millions of units of books and publications relating to Superman and generated revenues in the tens of millions of dollars.[69]

- Morris estimates that these figures place the Superman in the "upper echelon of comic properties by unit sales and revenue generated."[70]

- "Superman's popularity in the comic book sector and his importance in the industry is also reflected, in part, by the record-setting valuations the comic books and other SUPERMAN merchandise enjoy. For example, *Action Comics* No. 1—which is Superman's debut—is one of the world's most sought-after comics. In 2014, an issue of *Action Comics No. 1* was reportedly sold for $3.2 million in an eBay auction, and in April 2021, another copy sold for slightly more—$3.25 million—in a private sale."[71]

- "Continually over the decades since 1939, [Opposer] has also created and sold numerous comic book titles based on other characters in the Superman universe, including Superman Action Comics, Man of Steel, Supergirl, Superboy, The Legion of

---

[68] Morris Testimony Decl. ¶ 15 (42 TTABVUE 5-6). Because Opposer designated the sales of its Superman comics confidential, we refer to it in general terms. However, because Opposer uses the general term "hundreds of millions" in the Morris declaration, we quote the Morris declaration verbatim.

[69] Morris Testimony Decl. ¶ 15 (42 TTABVUE 6). Because Opposer designated the sales of the Superman books and publications and revenues confidential, we discuss those figures in general terms.

[70] Morris Testimony Decl. ¶ 15 (44 TTABVUE 6).

[71] Morris Testimony Decl. ¶ 16 (44 TTABVUE 6).

Super-Heroes, Adventures with the DC Super Heroes, and DC Super Friends. All of these properties use the S-Shield Design in connection with one or more of their respective characters and have been commercially successful."[72]

● "The Superman films have been enormously successful for decades. [Opposer's] Superman films include *Superman* (1978), *Superman II* (1981), *Superman III* (1983), *Superman IV: The Quest for Peace* (1987), *Superman Returns* (2006), *Man of Steel* (2013), *Batman v. Superman: Dawn of Justice* (2016), and *Justice League* (2017), which collectively have totaled over $1.3 billion in domestic box office revenues. In particular, *Man of Steel*'s U.S. box office revenue was nearly $300 million, *Batman v. Superman: Dawn of Justice*'s U.S. box office revenue exceeded $330 million, and *Justice League*'s U.S. box office revenue was nearly $230 million. Earlier films grossed an aggregate of approximately $500 million in box office revenue. All of the foregoing films feature Superman wearing his iconic costume emblazoned with the S-Shield Design across his chest."[73]

● "Superman has also enjoyed success through television. In the 1950's, *The Adventures of Superman* aired for over 100 episodes. CBS ran *The New Adventures of Superman*, a cartoon, from 1966 to 1969. In 1973, Hanna-Barbara produced *Super Friends*, a television cartoon featuring Superman and other characters. Later, [Opposer] produced several television series featuring Superman and related characters, including *Smallville*, *Super Friends*, *The Superman Batman Adventures*,

---

[72] Morris Testimony Decl. ¶ 19 (44 TTABVUE 6-7).

[73] Morris Testimony Decl. ¶ 21 (44 TTABVUE 7).

*Superman: The Animated Series*, *Teen Titans*, *Krypto the Superdog* (featuring the Super-Pets), and *Young Justice*. ABC's *Lois & Clark*, named for Lois Lane and Clark Kent, ran from 1993 to 1997. As a recent example, [Opposer] helped produce *Smallville* on the WB and CW networks, which imagined Superman as a teenager and ran from 2001 to 2011. With over 200 episodes and 10 seasons, the show is one of the longest-running comic book hero television series in history."[74] The television shows prominently featured the "S" shield design.[75]

● "[Opposer] has produced numerous video games both starring and featuring the Superman character, including *Superman: The New Adventures* (Nintendo 64), *Superman: Shadow of Apokolips* (PlayStation 2, Nintendo GameCube), *Superman: The Man of Steel* (Xbox), *Superman: Countdown to Apokolips* (Gameboy Advance), *Superman The Greatest Superhero* (V-Smile), *Superman Returns* (Nintendo DS, PlayStation 2, Xbox, Xbox 360), *Superman* (iOS), *Injustice: Gods Among Us* (Xbox 360, PlayStation 3, PlayStation 4, Xbox One, Microsoft Windows, Wii U), and *Injustice 2* (Android, iOS, PlayStation 4, Xbox One, Microsoft Windows)."[76]

● "Although WBCP [Warner Bros. Consumer Products Inc., Opposer's licensing agent] also licenses such iconic properties as Harry Potter, Looney Tunes and Friends, Superman is one of WBCP's strongest properties based on revenue, familiarity, reach, size and scope of our overall licensing programs in terms of amount

---

[74] Morris Testimony Decl. ¶ 24 (44 TTABVUE 8).

[75] Morris Testimony Decl. ¶¶ 25 and 26 and Exhibit B (44 TTABVUE 9 and 42 TTABVUE 31-32). Opposer improperly designated Exhibit B as confidential.

[76] Morris Testimony Decl. ¶ 27 (44 TTABVUE 9).

of licensees and the amount of products that we develop. Over the many years of Superman's existence, the public has spent billions of dollars on hundreds of thousands of different licensed products sold in connection with the Superman property and under the SUPERMAN Marks."[77]

● Opposer authorizes Warner Brothers Consumer Products to license the SUPERMAN marks across a comprehensive set of products. "The property is active in the vast majority of [numerous] driver categories of products and in connection with the over [thousands of] different product types within those categories. Over the course of several decades, there have been hundreds of thousands of distinct products licensed under the SUPERMAN Marks through scores of licensees."[78]

● From 2005 through 2019, the Superman properties generated tens of millions of dollars in annual licensing revenues. Opposer's licensing revenues are a small fraction of the revenue generated by the retail sales.[79]

● Opposer licenses the "S" shield design marks for costumes, "iPhone cases and accessories, headphones, lawn and home décor, bedding, wall coverings, inflatables, automobile accessories, baking accessories, blankets, stickers, lunch boxes, aprons, iron-on designs, fabric by the yard, mouth guards, purses, towels, performance

---

[77] Morris Testimony Decl. ¶ 32 (44 TTABVUE 10).

[78] Morris Testimony Decl. ¶ 33 (42 TTABVUE 11) (confidential). Opposer designated the driver categories and the number of current licensed products confidential, so we refer to them in general terms.

[79] Morris Testimony Decl. ¶ 34 (42 TTABVUE 11). Opposer designated its licensing revenues as confidential, so we refer to them in general terms.

enhancing bracelets, key chains, watches, credit cards, bubble gum dispensers, navel rings, decorative emblems, gumball tubes and button pins."[80]

● Opposer has received extensive unsolicited media coverage in connection with its SUPERMAN marks.[81] For example,

➢ Slate website (slate.com) (October 10, 2020)

> Trump Reportedly Wanted to Wear Superman Shirt to Surprise People When He Left Hospital
>
> President Donald Trump really wanted a made-for-TV moment when he left the hospital. While he was at Walter Reed getting treated for Covid-19, the president pushed the idea of looking weak and frail when he left the hospital only to rip open his button-down shirt and reveal a Superman t-shirt underneath, according to the New York Times.[82]

---

[80] Morris Testimony Decl. ¶¶ 37 and 38 (44 TTABVUE 12). Morris explains that the Warner Brothers Consumer Products licenses all of the SUPERMAN properties as a package. "Individual components—such as the S-Shield Design or other indicia— are typically not licensed separately but rather as a whole package. Nevertheless, virtually all "SUPER"-licensed merchandise contains some reference to the S-Shield Design on the product, label, packaging or marketing materials." *Id*. at ¶ 31 (44 TTABVUE 10).

[81] 37-41 TTABVUE. Much of Opposer's evidence of unsolicited media coverage is needlessly cumulative. It is not necessary that Opposer introduce all the articles that include a passing reference to Superman. *See, e.g.*, 38 TTABVUE 694, 701, 710, 732, 740, 1096, 1099, 1242, 1450, 1454, 1460, 1474 and 1705. Keeping in mind that Opposer does not want to give short shrift to presenting a persuasive case, Opposer's evidentiary presentation would be more persuasive if it limited its proffer to the evidence it believes is most probative of the character's and marks' renown.

Considering how much evidence regarding unsolicited media coverage Opposer introduced, it would have been helpful if Opposer had drawn attention to the probative portions of the evidence by highlighting the information it deemed important instead of introducing thousands of pages of evidence in the hope that as we wade through it we will find something that is probative. It is not the function of the Board to scour the record in search of facts or evidence to support a party's position. The Board is entitled to assistance from counsel, and an invitation to search without guidance is not useful. *Cf. N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) ("It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work."); *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (same).

[82] 40 TTABVUE 452. *See also* Complex website (complex.com) (October 10, 2020) ("Trump Reportedly Wanted to Do a Superman Shirt Reveal After His Hospital Release" attributing

> Superman appeared on the cover of the March 14, 1988 issue of Time magazine.[83] The cover is reproduced below:



> New York Post (June 16, 1959)

TV'S 'SUPERMAN' KILLS SELF

And in spite of his appearance in such prestige films as *Gone with the Wind, So Proudly We Hail,* and *From Here to Eternity,* it was as Superman that George Reeves achieved his measure of immortality. **"Superman is a legend,"** said Noel Neill. "We had no idea that we were involved with anything that would go on and on, and I'm sure it will still be going long after we're all gone."[84]

---

the report to The New York Times) (40 TTABVUE 447); Voz Wire website (vozwire.com) (October 12, 2020) (same) (40 TTABVUE 455).

[83] 39 TTABVUE 48.

[84] 38 TTABVUE 335.

(Emphasis added).

➢ Cable News Network, CNN Wire (December 30, 2011)

> The top 10 gaming stories of 2011
>
> Perhaps the most notable was "DC Universe Online," which was released in January and tried to capitalize on the power of DC Comics. They let players act out their comic hero/villain fantasies in the DC Universe and interact with **iconic characters like Superman**, Joker and Wonder Woman.[85] (Emphasis added).

➢ Philadelphia Enquirer (June 30, 2006)

> Superman soars into the 21st century …
>
> If you mess with Supey, you'd better mess right.
>
> **Superman is such an iconic figure** – the not-a-bird, not-a-plane, able-to-leap-tall-buildings, curly-forelocked, split-personality, **S-chested**, cape-swathed Kryptonian savior of the human race – well, **he's as much a part of the pop-cult consciousness as Mickey Mouse, Marilyn Monroe, the Beatles**.[86] (Emphasis added).

➢ The Dallas Morning News (March 26, 2010)

> Liukin launching girls clothes line
>
> Warner Bros. partnered with [Nastia] Liukin [champion gymnast and five-time Olympic medalist] to create the Supergirl by Nastia brand that uses **the famous S shield**.[87] (Emphasis added).

Finally, we note the entry for "Superman" in the ENCYLOPAEDIA BRITANNICA

(Britannica.com) (accessed September 20, 2022):[88]

---

[85] 38 TTABVUE 656.

[86] 38 TTABVUE 1231.

[87] 38 TTABVUE 1447.

[88] The Board may take judicial notice of information from encyclopedias. *B.V.D. Licensing Corp. v. Body Action Design Inc.*, 846 F.2d 727, 6 USPQ2d 1719, 1721 (Fed. Cir. 1988)

**Superman**

Fictional character



Superman, American comic strip superhero created for DC Comics by writer Jerry Siegel and artist Joe Shuster. Superman first appeared in *Action Comics*, no. 1 (June 1938).

**Superman**

# The Man of Steel in the Golden Age

Superman's origin is perhaps one of the best-known stories in comic book history.

The entry in the encyclopedia is probative of Superman's renown. *Cf. B.V.D. Licensing Corp.*, 6 USPQ2d at 1720 ("When a trademark attains dictionary recognition as a part of the language, we take it to be reasonably famous.").

Applicant, in its brief, did not contest the commercial strength of Opposer's "S" shield design marks.

In view of the foregoing, we find that Opposer's "S" shield design marks fall on the very strong side of the fame spectrum for likelihood of confusion purposes.

---

("dictionaries and encyclopedias may be consulted"); *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1934 n.61 (TTAB 2011), *aff'd,* 188 F. Supp.3d 22 (D.D.C. 2016), *aff'd*, 743 F. App'x 457, 128 USPQ2d 1172 (D.C. Cir. 2018); *In re Broyhill Furniture Indus. Inc.*, 60 USPQ2d 1511, 1514 n.4 (TTAB 2001) (dictionary entries and other standard reference works).

In sum, the "S" shield design marks are inherently or conceptually strong and they are commercially strong. Therefore, the "S" shield design marks are entitled to a broad scope of protection.

Having proven that its "S" shield design marks are commercially strong or famous, the factor of fame alone is not sufficient to establish likelihood of confusion. If that were the case, having a famous mark would entitle the owner to a right in gross, and that is against the principles of trademark law. *See Univ. of Notre Dame du Lac v. J. C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983):

> The fame of the [plaintiff's] name is insufficient in itself to establish likelihood of confusion under 2(d). "Likely * * * to cause confusion" means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in gross, which is contrary to principles of trademark law and to concepts embodied in 15 U.S.C. 1052(d).

*See also Recot*, 54 USPQ2d at 1898 ("[F]ame alone cannot overwhelm the other du Pont factors as a matter of law.").

2. The similarity or dissimilarity and nature of the goods and services

"Since his first appearance, Superman has become an international star of comic books, radio, television and film and is responsible for generating billions of dollars in revenue in the United States alone," states Kevin Morris, Vice President of Opposer's licensing agent, Worldwide Franchise Management and Marketing for

Warner Brothers Consumer Products, Inc.[89] He continues: "Superman's success in the field of comics is unparalleled, and he has become one of the most enduring and recognizable popular culture characters in this century and the last."[90] "The unbridled success of the publications prompted [Opposer] to produce other entertainment properties that feature Superman, including major motion pictures."[91] "The Superman films have been enormously successful for decades."[92] "Superman has also enjoyed success through television."[93] "[Opposer] has produced numerous video games both starring and featuring the Superman character."[94]

A mark, such as the "S" shield design, that has become famous in the entertainment field is often licensed for use on a wide variety of collateral or merchandising products. The Board has stated:

> The licensing of commercial trademarks for use on "collateral" products (such as clothing, glassware, linens, etc.), which are unrelated in nature to those goods or services on which the marks are normally used, has become a common practice in recent years. *See: General Mills Fun Group, Inc. v. Tuxedo Monopoly, Inc.*, 204 USPQ 396, 400 [where we stated that such use is a matter of common knowledge and "has become a part of everyday life which we cannot ignore"], *affirmed* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) [where the Court of Customs and Patent Appeals noted that "'collateral product' use is a matter of textbook discussion (see J. Gilson, Trademark Protection and Practice § 5.05[10] (1980) and frequent

---

[89] Morris Testimony Decl. ¶ 13 (44 TTABVUE 5).

[90] Morris Testimony Decl. ¶ 15 (44 TTABVUE 5).

[91] Morris Testimony Decl. ¶ 20 (44 TTABVUE 7).

[92] Morris Testimony Decl. ¶ 21 (44 TTABVUE 7).

[93] Morris Testimony Decl. ¶ 24 (44 TTABVUE 8).

[94] Morris Testimony Decl. ¶ 27 (44 TTABVUE 9).

> commentary (see Grimes and Battersby, The Protection
> of Merchandising Properties, 69 T.M. Rep. 431 (1979) and
> references cited therein).").

*In re Phillips-Van Heusen Corp.*, 228 USPQ 949, 951 (TTAB 1986). *See also L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1889 (TTAB 2008) ("It is common knowledge, and a fact of which we can take judicial notice, that the licensing of commercial trademarks on 'collateral products' has become a part of everyday life."); *Turner Entm't Co. v. Nelson*, 38 USPQ2d 1942, 1945 (TTAB 1996) ("It is common knowledge, and in the present case, undisputed that video games, t-shirts, beach towels, caps and other logo-imprinted products are used as promotional items for a diverse range of goods and services.").

Morris continues, "[t]he Superman property has also launched a merchandising juggernaut that has generated billions of dollars in retail sales of licensed products."[95] "[T]he Superman character represents one of the most successful licensing brands in the United States."[96]

> 37. [Opposer] licenses the Superman property (including the SUPERMAN Marks) in connection with all types of products. For example, it licenses the property to well-known clothing and costume manufacturers, including Rubie's Costume Co., Kids Republic, Inc., Junk Food Clothing Co. and Converse, Inc. [Opposer] also licenses the Superman property to toy manufacturers – including Mattel and Lego, which are two of the largest toy companies in the world – and to Six Flags Theme Parks. ...
>
> 38. [Opposer] licenses the Superman property for other products as well, including iPhone cases and accessories, headphones, lawn and home décor, bedding, wall

---

[95] Morris Testimony Decl. ¶ 13 (44 TTABVUE 5).

[96] Morris Testimony Decl. ¶ 30 (44 TTABVUE 10).

coverings, inflatables, automobile accessories, baking accessories, blankets, stickers, lunch boxes, aprons, iron-on designs, fabric by the yard, mouth guards, purses, towels, performance enhancing bracelets, key chains, watches, credit cards, bubble gum dispensers, navel rings, decorative emblems, gumball tubes and button pins. These licensed products are available online and at well-known national chains, such as Amazon, Walmart, Target, JC Penny, Kohl's, Home Depot, Old Navy, Lowe's, as well as other retailers.[97]

We reproduce below a representative sample of a licensed iPhone case offered for sale on the Walmart website (walmart.com).[98]



Opposer also registered the mark reproduced below for the "issuance of credit cards; providing cash and other rebates for credit card use as part of a customer loyalty program," in International Class 36.

---

[97] Morris Testimony Decl. ¶¶ 37 and 38 (44 TTABVUE 12).

[98] Morris Testimony Decl. Exhibit F (43 TTABVUE 633) (improperly designated confidential).



Opposer contends that because Opposer has a successful and diverse licensing business encompassing a wide variety of goods and services, "consumers encountering Applicant's Mark in connection with cell phone repair services are likely to mistakenly believe that [Opposer] has approved or authorized use of Applicant's Mark on the basis that Applicant's Mark is similar to and a reference to the S-Shield Design."[99] In other words, "[b]ecause consumers are accustomed to seeing the S-Shield Design in connection with cell phone cases and cell phone accessories and are likely to see Applicant's Mark being used on these goods while soliciting Applicant's cell phone repair services, consumers are likely to mistakenly believe that use of Applicant's mark is authorized by [Opposer]."[100]

However, Opposer did not introduce any testimony or other evidence regarding how many consumers purchased Opposer's "S" shield design mark iPhone cases or accessories, the extent to which Opposer or its licensees advertised such products, or whether any third-parties of branded cell phone cases and accessories also render "installation, maintenance and repair of cell phone related hardware" or vice versa that would support its contention. *See, e.g.*, *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 67 USPQ2d 1481 (6th Cir. 2003):

---

[99] Opposer's Brief, p. 41 (56 TTABVUE 43).

[100] Opposer's Brief, pp. 43-44 (56 TTABVUE 45-46).

Plaintiff Appellant Kellogg Company appeals from the district court's affirmation of the Trademark Trial and Appeal Board's (TTAB) decision to permit the registration of the word mark "Toucan Gold" by Defendant Appellee Toucan Golf, Inc. (TGI), a manufacturer of promotional golf equipment.

\* \* \*

Kellogg is primarily a producer of breakfast cereal, but has branched off from cereal and sold products in other industries on a limited basis. It has also at times licensed its name and characters to outside companies. … The district court found that Kellogg's presence in the golf industry was insignificant, and nothing more than a marketing tool to further boost sales of its cereal. We agree. We find that one thirty second advertisement does not render Toucan Sam a golfer, nor does a novelty catalog make Kellogg a player in the golfing industry. In any event, trademark law is grounded on a likelihood of confusion standard. We find that no consumer would associate Kellogg with top-line golf equipment based on Kellogg's extremely limited licensing of its characters on novelty items. … We find the parties' products completely unrelated. [This] … factor therefore supports a conclusion that confusion is not likely to occur.

*Id.*, 67 USPQ2d at 1482, 1485-86.

Finally, Opposer contends that cell phone cases and accessories and Applicant's "installation, maintenance and repair of cell phone related hardware" are complementary, inasmuch as Applicant offers cell phone cases and accessories from the location where it renders its services.[101]

The issue before us is whether Applicant's "installation, maintenance and repair of cell phone related hardware" and Opposer's entertainment related goods and services (i.e., comic books, movies, television series, and video games), as well as its

---

[101] Opposer's Brief, pp. 43-44 (56 TTABVUE 45-46). Eric Vines testified that "if anyone someone [sic] needs a case for their phone, we will bring that when we come on site. We sell cases and screen protectors and things of that nature." Vines Discovery Dep., p. 41 (36 TTABVUE 417). The cases do not display Applicant's CELLULAR NERD mark. The cases are unbranded unless the customer requests a particular branded case and Applicant can acquire it for them. *Id.*

myriad array of licensed products sold or distributed under circumstances likely to give rise to the mistaken belief that the goods and services emanate from the same source. *See Coach Servs.*, 101 USPQ2d at 1722; *Berghoff Rest. Co. v. Washington Forge, Inc.*, 225 USPQ 603, 608 (TTAB 1985) ("The crux of the issue before us is whether the respective goods sold and services rendered under the marks are sufficiently related in the minds of the common purchasers to result in a likelihood of confusion.").

We are not persuaded that the goods and services for Applicant's "installation, maintenance and repair of cell phone related hardware" services and Opposer's entertainment-related goods and services and its array of licensed products, including cell phone cases and accessories, are similar and related. As discussed at length above, the "S" shield design marks are famous indicia of the Superman character and the licensed products bear those marks as collateral source identification, *see, for example*, the cellphone case reproduced above, rather than for establishing a reputation for the mark among purchasers of the licensed products.

For example, the purchaser of an iPhone case emblazoned with the "S" shield design is unlikely to believe that Applicant's "installation, maintenance and repair of cell phone related hardware" services bearing its mark is somehow associated with the source of the iPhone case. In other words, Applicant's mark and Opposer's marks will not likely give rise to the mistaken belief that the parties' respective goods and services emanate from the same source.

If we accept Opposer's contention that, because Opposer has licensed its "S" shield design marks for use on many products—none of which are repair services of any kind—consumers are more likely to think upon encountering Applicant's "installation, maintenance and repair of cell phone related hardware" services, Opposer has expanded into cell phone repair services[102]—a specialized service field—that would be tantamount to granting Opposer rights in gross. The recognition of the greater diversity and expansion of businesses in a modern economy is not, in and of itself, sufficient to support an inference that purchasers are apt to believe that disparate products or services emanate from the same source.

The fame of Opposer's "S" shield design marks does not ipso facto mean that consumers will associate Opposer's "S" shield design marks with Applicant's type of "installation, maintenance and repair of cell phone related hardware" services. As noted above, there must be a reasonable basis for the public to associate the source of "installation, maintenance and repair of cell phone related hardware" services with Opposer's "S" shield design marks. On this record, we cannot make the inference Opposer urges.

In short, Opposer failed to offer persuasive evidence that Applicant's "installation, maintenance and repair of cell phone related hardware" services are similar and related to Opposer's goods and services.

We find this *DuPont* likelihood of confusion factor weigh against finding there is a likelihood of confusion.

---

[102] Opposer's Brief, p. 41 (56 TTABVUE 43).

3.    Established, likely-to-continue channels of trade

Opposer contends that because the description of goods and services in Opposer's pleaded registrations and Applicant's application have no restrictions or limitations, the Board must presume the goods and services are offered in all normal channels of trade and to all classes of consumers.

> Here, neither [Opposer's] registrations nor the Application include any limitations on channels of trade. Accordingly, the Board must presume that Applicant's services will move through the normal channels of trade and to all classes of consumers, which inevitably overlap with the similarly unrestricted trade channels and consumers for DC Comics' goods and services.[103]

Opposer's contention is accurate as a general proposition of law. However, as noted above, Kevin Morris, Vice President of Opposer's licensing agent, testified that Opposer licenses the "S" shield design mark (i) to clothing and costume manufacturers, including Rubie's Costume Co., Kids Republic, Inc., Junk Food Clothing Co. and Converse, Inc., (ii) to toy manufacturers Mattel and Lego, Six Flags Theme Parks, and (iii) on an array of other products, including iPhones sold online and at well-known national chains, such as Amazon, Walmart, Target, JC Penny, Kohl's, Home Depot, Old Navy, Lowe's, as well as other retailers.[104]

Applicant, on the other hand, has a kiosk in Navarre, Florida (about 30 miles from lower Alabama), which is actually a truck that it built a cell phone store into that it parks near the beach.[105] Applicant formerly had some retail locations and was

---

[103] Applicant's Brief, p. 46 (56 TTABVUE 49).

[104] Morris Testimony Decl. ¶¶ 37 and 38 (44 TTABVUE 12).

[105] Vines Discovery Dep., p. 33 (36 TTABVUE 408-409).

working with the Air Force to open some locations inside its commissaries on the PX.[106] Applicant also abandoned plans to open stores in malls because it believes that, post-Covid, mall locations are no longer profitable.[107]

While Applicant may render its "installation, maintenance and repair of cell phone related hardware" from mobile units, brick and mortar stores, and, perhaps, through the mail, and Opposer's goods and services are offered online and through various retail locations, Opposer has failed to show the overlap between the channels of trade. That is, there is no testimony or evidence that shows consumers will encounter Applicant's "installation, maintenance and repair of cell phone related hardware" and Opposer's "S" Shield design goods and services in the same marketing milieu.

We find that this *Dupont* factor weighs against finding a likelihood of confusion.

### 4. The similarity or dissimilarity of the marks

We now turn to the *DuPont* factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *DuPont,* 177 USPQ at 567. "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC,* 126 USPQ2d 1742, 1746 (TTAB 2018) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019); *accord Krim-Ko Corp. v. Coca-Cola Bottling Co.*, 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is

---

[106] *Id.*

[107] *Id.*

sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.") (citation omitted).

"The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018) (quoting *Coach Servs.*, 101 USPQ2d at 1721); *Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 103 USPQ2d 1435, 1440 (Fed. Cir. 2012).

We keep in mind that "[s]imilarity is not a binary factor but is a matter of degree." *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014) (quoting *In re Coors Brewing Co.*, 68 USPQ2d at 1062).

For ease of reference, we reproduce the marks at issue to facilitate our analysis:

|  Opposer's Marks | Applicant's mark |
| :---: | :---: |









In analyzing the similarity or dissimilarity of the marks, we note that a potential consumer who is aware of Opposer's famous "S" shield design marks is more likely to be attuned to its similarity to Applicant's mark upon encountering the latter. In this regard, "a purchaser is less likely to *perceive* differences from a famous mark." *B.V.D. Licensing v. Body Action Design*, 846 F.2d 727, 6 USPQ2d 1719, 1722 (Fed. Cir. 1988) (Nies, J., dissenting) (emphasis in original), and quoted with approval in *Kenner Parker Toys,* 22 USPQ2d at 1456 (Fed. Cir. 1992) and *Nike Inc. v. Maher,*

100 USPQ2d 1018, 1022 (TTAB 2011). Nevertheless, the similarity between the marks (i.e., Opposer's "S" shield design marks and Applicant's CELLULAR NERD character ripping open his shirt to reveal CN in a diamond shield) is outweighed by the differences between the marks.

For example, the term CELLULARNERD.com is the dominant part of the mark because it appears prominently in large font, and "[i]n the case of marks, such as Applicant's, consisting of words and a design, the words are normally accorded greater weight because they are likely to make a greater impression upon purchasers, to be remembered by them, and to be used by them to request the goods." *In re Aquitaine Wine USA, LLC*, 126 USPQ2d 1181, 1184 (TTAB 2018) (citing *Viterra*, 101 USPQ2d at 1908); *CBS Inc. v. Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir. 1983)). That is because "[t]he word portion of a word and design mark 'likely will appear alone when used in text and will be spoken when requested by consumers." *Aquitane Wine USA*, 126 USPQ2d at 1184 (quoting *Viterra*, 101 USPQ2d at 1911).

There is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, such as a common dominant element, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *Viterra*, 101 USPQ2d at 1908; *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

The term CELLULARNERD.com also dominates the mark because it identifies the character superimposed over the letters "CN" in the diamond shield design. This creates the commercial impression of a tech nerd ready to solve your cell phone

problems in his persona as a tech nerd, as opposed to the letter "S" shield design marks symbolizing a specific superhero. As such, consumers may easily distinguish Applicant's mark from Opposer's "S" shield and design marks. Because Applicant's mark conveys the image of a tech-savvy, problem-solving nerd with a vastly different set of skills than Opposer's superhero, consumers will not view the marks in their entireties as sufficiently similar to cause them to mistakenly believe there is an association with Opposer.

In sum, the differences between the marks outweigh their similarities and engender different commercial impressions sufficient to distinguish the marks. Accordingly, we find the marks when considered in their entireties are more dissimilar than similar.

### 5. Conclusion

Despite the strength of Opposer's "S" shield design marks, we find that the differences in the respective goods and services, as well as differences in the marks, are significant countervailing factors. *See Burns Philp Food Inc. v. Modern Prods. Inc.*, 24 USPQ2d 1157, 1160 (TTAB 1992) ("[E]ven though the parties' goods are relatively inexpensive and would presumably be purchased without much care, and even though opposer's mark is famous in the field of spices, it is our firm belief that applicant's mark, considered in its entirety, is sufficiently different from opposer's in sound, appearance and meaning that confusion is unlikely."), *aff'd mem.*, 1 F.3d 1252, 28 USPQ2d 1687 (Fed. Cir. 1993).

Because the differences in the marks outweigh their similarities, and because the goods and services are not related and are offered in different channels of trade to different classes of consumers, we find that Applicant's CELLULAR NERD mark for "installation, maintenance and repair of cell phone related hardware" services is not likely to cause confusion with Opposer's "S" shield and design marks for goods and services in the entertainment field and Opposer's wide variety of collateral or merchandising products.

We dismiss the Section 2(d) likelihood of confusion claim.

## V.   Dilution

Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."[108] Section 43(c)(2)(B) of the Trademark Act, 15 U.S.C. § 1125(c)(2)(B). Dilution may be likely "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." Section 43(c)(1) of the Trademark Act, 15 U.S.C. § 1125(c)(1).

The Federal Circuit has set forth the following four elements a plaintiff must prove in a Board proceeding in order to prevail on a claim of dilution by blurring:

(1) the plaintiff owns a famous mark that is distinctive;

---

[108] While the statute contemplates dilution by blurring and by tarnishment, Opposer alleges only dilution by blurring. Notice of Opposition ¶ 18 (1 TTABVUE 14-15). *See also* Opposer's Brief, p. 49 (56 TTABVUE 51) ("Applicant's Mark is likely to cause dilution by blurring of the S-Shield Design.").

(2) the defendant is using a mark in commerce that allegedly dilutes the plaintiff's famous mark;

(3) the defendant's use of its mark began after the plaintiff's mark became famous; and

(4) the defendant's use of its mark is likely to cause dilution by blurring or by tarnishment.

*Coach Servs.*, 101 USPQ2d at 1723-24.

### A. Fame for Dilution

A threshold question in a federal dilution claim is whether the plaintiff's mark is "famous." *Coach Servs.*, 101 USPQ2d at 1724. A mark is famous for dilution purposes "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." Section 43(c)(2)(A) of the Trademark Act, 15 U.S.C. § 1125(c)(2)(A). There are four non-exclusive factors to consider when determining whether a mark is famous:

i. The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

ii. The amount, volume, and geographic extent of sales of goods or services offered under the mark.

iii. The extent of actual recognition of the mark.

iv. Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

*Id. See also McDonald's Corp. v. McSweet LLC*, 112 USPQ2d 1268, 1286 (TTAB 2014).

While fame for likelihood of confusion is a matter of degree along a continuum, fame for dilution "is an either/or proposition" – it either exists or it does not. *Coach Servs.*, 101 USPQ2d at 1724 (quoting *Palm Bay Imps.*, 73 USPQ2d at 1694). Accordingly, a mark can acquire "sufficient public recognition and renown to be famous for purposes of likelihood of confusion without meeting the more stringent requirement for dilution fame." *Coach Servs.*, 101 USPQ2d at 1724 (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1722 (TTAB 2007)).

The testimony and evidence regarding the fame or commercial strength of Opposer's originally pleaded "S" shield design marks, reproduced below, previously discussed in the likelihood of confusion section, which addresses the four factors set out above, are sufficient to prove that the marks are famous for purposes of dilution.

 

In addition, the above-noted testimony and evidence is sufficient to prove that the "S" shield design marks shown above were famous for dilution purposes before Applicant's first use of its mark.

However, Opposer's testimony and evidence does not support finding that the mark in Registration No. 6304144, reproduced below, for the "issuance of credit cards;

providing cash and other rebates for credit card use as part of a customer loyalty program" was famous before Applicant's first use of its mark.



As noted above, the mark registered March 30, 2021, from application Serial No. 88820394 filed March 4, 2020, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Opposer's claim of first use anywhere and in commerce as of July 17, 2019. Opposer did not proffer any testimony or evidence as to when Opposer first used that design as a trademark.[109] Accordingly, pursuant to Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b), Opposer may rely on the March 4, 2020 filing date of the underlying application for the registration as its constructive date of first use.

However, Applicant filed its application Serial No. 87755620, at issue in this proceeding, on January 15, 2018, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1052(a), based upon Applicant's claim of first use anywhere and use in commerce since at least as early as August 31, 2014. In addition, in response to Opposer's

---

[109] Kevin Morris testified that "[w]hen springing into action as Superman, Clark Kent is often depicted in comic books and media as ripping open the buttons of his shirt to reveal his Superman uniform underneath" and that the "shirt-ripping action, has become a longstanding, iconic indicia of the Superman property," but he did not testify as when Opposer first used the "shirt-ripping action" as a trademark on or in connection with any goods or services. Morris Testimony Decl. ¶¶ 10 and 11 (44 TTABVUE 4-5). The Morris testimony is more probative of a false suggestion of a connection claim under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), than the pleaded likelihood of confusion and dilution claims.

interrogatory No. 4, Applicant stated that "[b]y August 31, 2014, Applicant had used the trademark on a Facebook page advertising the services, and since October 15, 2017 on vans carrying out the tablet and phone repair services."[110]

Because Applicant used its mark and filed its application before any date on which Opposer may rely for the fame of the mark in Registration No. 6304144, we do not consider that mark in our dilution analysis.

###### B. Likelihood of Dilution

The final element of our dilution analysis assesses whether Applicant's mark is likely to dilute Opposer's marks. As noted above, dilution by blurring occurs when a substantial percentage of consumers, on seeing the junior party's use of a mark on its goods or services, are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods or services come from the famous mark's owner. *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1506 (TTAB 2015) (citing *UMG Recordings Inc. v. Mattel Inc.*, 100 USPQ2d 1868, 1888 (TTAB 2011) (citing *Toro Co. v. ToroHead Inc.*, 61 USPQ2d 1164, 1183 (TTAB 2001))).

The Trademark Act enumerates six non-exhaustive factors a tribunal may consider in determining whether a mark is likely to cause dilution by blurring:

> (i) The degree of similarity between the mark or trade name and the famous mark.

> (ii) The degree of inherent or acquired distinctiveness of the famous mark.

---

[110] 36 TTABVUE 12, 23.

(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

(iv) The degree of recognition of the famous mark.

(v) Whether the user of the mark or trade name intended to create an association with the famous mark.

(vi) Any actual association between the mark or trade name and the famous mark.

Section 43(c)(B)(i)-(vi).

> 1. Whether Applicant intended to create an association with Opposer's "S" shield design marks

We turn first to the factor analyzing whether Applicant intended to create an association with Opposer's "S" shield design marks. Opposer argues that Applicant intended to create an association with Opposer's "S" shield design marks as shown by Applicant's statements during the prosecution of its application.[111] During prosecution of Applicant's CELLULAR NERDS application, the USPTO cited as a Section 2(d) likelihood of confusion bar the registered mark CELL NERDS and design, reproduced below, for "cell phone battery chargers; cell phone battery chargers for use in vehicles; cell phone cases," in International Class 9:[112]



---

[111] Opposer's Brief, p. 54 (56 TTABVUE 56).

[112] Registration No. 4190721, registered August 14, 2012. The registration was ministerially cancelled on June 17, 2020, for failure to file a declaration of continued use under Section 8 of the Trademark Act, 15 U.S.C. § 1058. May 2, 2018 Office Action (TSDR 2 and 7).

In response to the Section 2(d) refusal, Applicant argued that its mark is not similar to that CELL NERDS mark because, inter alia, its mark incorporates the letters "CN" in a diamond shape "reminiscent of Superman's crest."[113] In this regard, Adrian Coates, the artist who drew Applicant's mark, was adamant that he did not copy any images so as to avoid this kind of legal problem.[114] However, Coates testified that Vines asked him "to create a diamond shape with the letters C and N inside of it."[115] In fact, Vines insisted on the shape of diamond, "a jewel, like a jeweler's diamond."[116]

> Q. So Mr. Vines instructed you to put a shape on the chest of the character?
>
> A. Yes.
>
> Q. And . . . the shape of that design was to be a five-sided diamond, cut in the shape that a diamond tends to be cut as a jewel.
>
> A. Correct.
>
> Q. And did Mr. Vines instruct you to put a letter or letters in that shape?
>
> A. Yes. The C and N in an offset manner.

---

[113] October 14, 2018 Response to an Office Action (TSDR 3 and 8). Applicant also stated that The CELLULARNERD.com character is pulling his shirt open "like Clark Kent would before changing into Superman." *Id.* However, as noted above in the discussion of fame for purposes of dilution, Opposer failed to prove that it used the "shirt-ripping action" as a trademark prior to Applicant's use of its mark and, therefore, we do not consider it in our dilution analysis.

[114] Coates Discovery Dep., pp. 17-18 and 33 (36 TTABVUE 59-60 and 75). *See also id.* at pp. 33-34 (36 TTABVUE 75-76) ("I try to not draw from illustrated media when I am creating imagery either for my own projects or for clients because you don't want to get too close to previously illustrated media.").

[115] Coates Discovery Dep., p. 18 (36 TTABVUE 60).

[116] Coates Discovery Dep., p. 19 (36 TTABVUE 61).

Q.     Did Mr. Vines instruct you to draw a character opening his shirt to reveal that shape?

A.     Yes.[117]

Vines corroborated Coates' testimony that he told Coates to draw a five-sided shield in the shape of a diamond.[118]

With respect to Applicant's argument in its Office Action response, Vines testified that the stated position was not correct.

Q.     So you have testified today that the shape of the shield and the pulling open of the shirt are not reminiscent of Superman.

[Objection]

A.     The company never took this approach. This is an attorney that is no longer with us, that was negligent while representing us, in my opinion.

Q.     Did this attorney represent you at the time he submitted this response?

A.     Yes, sir.

Q.     Did you rely on this response in order to have your application published?

A.     I never even read that response. I probably e-signed it. I'm sure, but I do not remember that.

Q.     I understand you don't remember this, but did the company rely on this submission in order to convince the Trademark Office?

---

[117] Coates Discovery Dep., p. 20 (36 TTABVUE 62). We consider Coates' testimony regarding the "shirt-ripping action" as it relates to whether Vines intended to create an association with Opposer's "S" shield design marks.

[118] Vines Discovery Dep., p. 71 (36 TTABVUE 447). According to Vines, he chose the five-sided shield because he like the shape of the diamond gemstone. *Id*.

A.   Yes, sir.[119]

___

Q.   At the time this was filed, was it the company's position that the diamond shape and the pulling open of the shirt referenced in the sentences you read were reminiscent or like similar attributes of the Superman character?[120]

[Parrying over response]

A.   I guess, when you compare the two side-by-side, it would be true at the time. But is not something that was taken into account at the design phase at all.[121]

"It is well settled that a client is bound by the actions of its attorneys." *Caymus Vineyards v. Caymus Med., Inc.,* 107 USPQ2d 1519, 1523 n.5 (TTAB 2013) (citing *CTRL Sys. Inc. v. Ultraphonics of N. Am. Inc.*, 52 USPQ2d 1300, 1302 (TTAB 1999) ("It is well settled that ... communication between the client and attorney is a two-way affair; and that action, inaction or even neglect by the client's chosen attorney will not excuse the inattention of the client so as to yield the client another day in court.")). There is no testimony that Applicant exercised due diligence to monitor counsel's action inasmuch as Eric Vines testified that the first time he saw the response to the Office Action stating Applicant's shield design is reminiscent of Superman's crest was at his discovery deposition.[122] Therefore, Applicant has no basis to excuse itself from counsel's actions.

---

[119] Vines Discovery Dep., p. 95 (36 TTABVUE 471).

[120] Vines Discovery Dep., p. 98 (36 TTABVUE 474).

[121] Vines Discovery Dep., p. 100 (36 TTABVUE 476).

[122] Even assuming arguendo that Applicant's former counsel acted without Applicant's authorization, counsel's response stating that the "S" shield design in Applicant's mark is

Nevertheless, counsel's arguments to overcome a likelihood of confusion refusal during the prosecution of Applicant's application are not an admission or concession that Applicant intended to call to mind Opposer's "S" shield design, let alone create an association with Opposer's "S" shield design marks.

> That a party earlier indicated a contrary opinion respecting the conclusion in a similar proceeding involving similar marks and goods is a fact, and that fact may be received in evidence **as merely illuminative of shade and tone in the total picture confronting the decision maker**. To that limited extent, a party's earlier contrary opinion may be considered relevant and competent. Under no circumstances, may a party's opinion, earlier or current, relieve the decision maker of the burden of reaching his own ultimate conclusion on the entire record. (Emphasis added).

*Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 198 USPQ 151, 153 (CCPA 1978). *See also Specialty Brands, Inc. v. Coffee Bean Distrib., Inc.,* 748 F.2d 669, 223 USPQ 1281 (CCPA 1984) ("While we place only limited weight on these statements in the application file [a contrary position before the USPTO], we consider this evidence to be relevant because it illustrates the variety of images that may be attributed to the mark SPICE VALLEY, which applicant seeks to register without restriction as to display, and the overall commercial impression it projects.").

When Applicant's counsel referred to the "S" shield design marks, he was attempting to distinguish Applicant's CELLULAR NERD mark, at issue here from the CELL NERDS mark reproduced above by analogizing Applicant's CN in a

---

reminiscent of Superman's crest, is probative that Applicant's mark conjures up Opposer's "S" shield design marks.

diamond to the "S" shield design to emphasize the differences between Applicant's mark and the CELL NERD mark. Applicant did not argue that its mark is reminiscent of the "S" shield design or that it calls to mind the "S" shield design. It was using a reference to the "S" shield design marks to point out distinguishing features of Applicant's mark.

The testimony and evidence of record does not persuade us that Applicant intended to create an association with Opposer's "S" shield design marks when it created its CELLULAR NERDS mark.

> 2.  The degree of similarity between Applicant's mark and Opposer's "S" shield design marks

The Board noted in *Nat'l Pork Bd. v. Supreme Lobster & Seafood Co.*, 96 USPQ2d 1497, 1497 (TTAB 2010), that,

> after finding in the affirmative on the question of pre-existing fame, an important question in a dilution case is whether the two involved marks are sufficiently similar to trigger consumers to conjure up a famous mark when confronted with the second mark.

In addition, we must determine not only whether there is an "association" arising from the similarity of the marks, but whether such association is likely to "impair" the distinctiveness of the famous mark. *Nike Inc. v. Maher*, 100 USPQ2d at 1023.

While we are not conducting a Section 2(d) likelihood of confusion analysis under this factor for dilution by blurring, we still consider the degree of similarity or dissimilarity of the marks in their entireties as to appearance, connotation, and commercial impression. *N.Y. Yankees P'ship*, 114 USPQ2d at 1506 (citing *Research in Motion Ltd. v. Defining Presence Mktg. Grp. Inc.*, 102 USPQ2d 1187, 1198 (TTAB

2012)). We consider the marks in terms of whether they are sufficiently similar in their overall commercial impressions that the required association exists. *N.Y. Yankees P'ship*, 114 USPQ2d at 1506 (citing *Nike Inc. v. Maher*, 100 USPQ2d at 1030).

In analyzing the degree of similarity between Applicant's mark and Opposer's claim to a proprietary interest in Clark Kent's "shirt ripping action," we do not include the "shirt-ripping action" in the analysis because Opposer did not prove its use as a mark prior to the filing date of Applicant's application.

Accordingly, just as we found that Applicant's mark is not similar to Opposer's "S" shield design marks for purposes of likelihood of confusion, we find that Applicant's mark is not similar enough to Opposer's asserted marks for purposes of dilution. Specifically, the dominance of the term "Cellular Nerd" in Applicant's mark identifies the character superimposed over the letters "CN" in the background diamond shield design. As noted above, this creates the commercial impression of a tech nerd ready to solve your cell phone problems in his persona as a tech nerd with a vastly different set of skills than Opposer's character identified by the letter "S" shield design marks. Because Applicant's mark conveys the image of a tech-savvy, problem-solving nerd rather than a superhero with a vastly different set of skills than Opposer's superhero, Applicant's mark does not call to mind or conjure the "S" shield design marks. *See Citigroup Inc. v. Capital City Bank Grp., Inc.*, 94 USPQ2d 1645, 1667 (TTAB 2010) (because CAPITAL CITY BANK was not similar enough to CITIBANK to be likely to cause confusion, it was also not similar enough to be likely to cause dilutive

impairment.), *aff'd on other grounds*, 637 F.3d 1344, 98 USPQ2d 1253. *See also Rolex Watch U.S.A., Inc. v. AFP Imaging Corp.*, 101 USPQ2d 1188, 1195-96 (TTAB 2011) (Opposer's ROLEX for watches and applicant's ROLL-X for X-ray tables that roll were not similar enough where survey showed that ROLL-X called to mind a feature of the goods (such as rolling, portable or X-ray) to more persons than thought of opposer's ROLEX for watches. No likelihood of blurring was proven.), *vacated on other grounds*, 107 USPQ2d 1626 (TTAB 2013).

> 3. The degree of inherent or acquired distinctiveness of Opposer's famous "S" shield design marks

Although we found that four of the registrations for Opposer's "S" shield design marks are inherently distinctive, three of Opposer's registrations for the "S" shield design are registered under the provisions of Section 2(f) of the Trademark Act (acquired distinctiveness). Nevertheless, the record is replete with evidence that Opposer's mark is commercially strong and has acquired distinctiveness due to Opposer's long use, promotional efforts and media recognition.

> 4. The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark

Considering the commercial strength of Opposer's "S" shield design marks, the record shows that Opposer is engaging in "substantially exclusive" use of its marks. Although Applicant has relied on third-party registrations to show that Opposer's "S" shield design marks are not inherently or conceptually strong, such registrations do not prove that the marks in those registrations are in use. *See Smith Bros. Mfg. Co. v. Stone Mfg. Co.*, 476 F.2d 1004, 177 USPQ 462, 463 (CCPA 1973) (the purchasing

public is not aware of registrations reposing in the USPTO); *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d at 1934. As we said in *In re Hub Distrib., Inc.,* 218 USPQ 284 (TTAB 1983):

> [I]t would be sheer speculation to draw any inferences about which, if any of the marks subject of the third[-]party registrations are still in use. Because of this doubt, third [-]party registration evidence proves nothing about the impact of the third-party marks on purchasers in terms of dilution of the mark in question or conditioning of the purchasers as to their weakness in distinguishing source.

*Id.* at 286. *See also Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200, 22 USPQ2d 1542, 1545 (Fed. Cir. 1992) ("As to strength of a mark, however, registration evidence may not be given *any* weight."). There is no other evidence of record to suggest that Opposer's use of its marks is not substantially exclusive.

5.    The degree of recognition of Opposer's famous "S" shield design marks

With respect to the degree of recognition of Opposer's famous "S" shield design marks, we have no direct evidence, e.g., a survey, showing a level of recognition of Opposer's marks. However, Opposer's evidence of strong and consistent presences in print and Internet media, television and feature films proves that Opposer's marks have attained a significant level of recognition.

6.    Any actual association between the mark or trade name and the famous mark

There is no evidence of any actual association between Applicant's mark and Opposer's "S" shield design marks, particularly given that Applicant is rendering its "installation, maintenance and repair of cell phone related hardware" services in a

limited trading area (i.e., Florida panhandle, including Pensacola, Milton, Navarre, Destin, Niceville, and Crestview Florida, as well as Gulf Shore and Seminal Alabama).[123]

C.     Dilution by blurring – Conclusion

After considering all of the evidence of record in regard to the Section 43(c) dilution by blurring factors, we find that Applicant's mark is not likely to cause dilution by blurring of Opposer's "S" shield design marks. We find in particular that despite the fame of Opposer's "S" shield design marks, Opposer's substantially exclusive use of its marks, and that Opposer's efforts suggest a strong degree of recognition for its marks, Opposer has not proven that Applicant's mark is similar enough to Opposer's marks to support a finding that dilution is likely.

We dismiss Opposer's claim of dilution by blurring under Section 43(c) of the Trademark Act.

**Decision**: We dismiss the opposition under Section 2(d) of the Trademark Act on the ground of likelihood of confusion and Section 43(c) of the Trademark Act on the ground of dilution by blurring.

---

[123] Applicant's supplemental response to Opposer's interrogatory No. 6 (36 TTABVUE 24); Vines Discovery Dep., p. 33 (36 TTABVUE 409).